# EXHIBIT 1

## BACKING AGREEMENT

THIS BACKING AGREEMENT (the "Agreement") is made this 08/15/2025 (the "Effective Date"), by and between Vishal Birsingh (the "Player") and Ace High Investments LLP, a United Kingdom Limited Liability Partnership (the "Backer") (the Player and the Backer being collectively known as the "Parties", and each sometimes being known as a "Party").

WHEREAS, the Player is an individual physically situated within the States of Michigan, New Jersey, Pennsylvania, or West Virginia where online casino gambling is legal, and wishes to partake in said casino gambling; and

WHEREAS, the Backer wishes to acquire a contingent interest in any proceeds realized by the Player in connection with their gaming play, in exchange for tendering to the Player funds to be used in carrying out such gaming play;

NOW, THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties do agree as follows:

1. **Transfer of Funds.** The Backer shall transfer to the Player various monies (cumulatively, the "Staking Sum"), in the lawful currency of the United States, via wire, immediately negotiable instrument, legal tender, or a reputable internet-based provider of currency transfer services, from time to time, as the purpose and intent of this Agreement may so require.

2. **Holding of Funds.** The Player shall place the Staking Sum in a depository account at a financial institution insured by the Federal Deposit Insurance Corporation, with such account being maintained in the Player's own name but containing solely the Staking Sum and any proceeds realized thereupon, together with whatever interest may from time to time be paid over by the correlative depository institution. Under no circumstances shall the Player permit the subject account to contain the Player's own separate monies, to contain monies belonging to any other persons (aside from the Player and the Backer), or to be otherwise co-mingled. Under no circumstances shall the Player permit the subject account to be subject to any direct debits or standing orders, nor may the Player permit the subject account to be used for coverage of any contingent or liquidated claims outstanding. The Player shall take steps to ensure the subject account *not* have overdraft protection, not be subject to overdraft, and not be subject to the imposition of any banking fees. The Player shall, where practicable, arrange for online access to be granted to the subject account, and shall furnish the Backer with the username and password requisite to monitor the subject account. The Backer, however, shall not exercise any dominion or control over the subject account, use such online access to initiate any transfers to or from the subject account, or utilize such online access for any purposes whatsoever other than the monitoring of funds.

3. **Calculation of Net Profit.** Calculated as wins minus losses realized in utilization of the Staking Sum for play in casino games consistent with this Agreement ("Net Profit"). As such, should such play yield one or more losses, any gains realized thereafter shall be applied:

   (i)   first to replenishment of the Staking Sum; and
   (ii)  second to net profit.

-1-

At no time shall the Player hold any interest other than bare legal title to the Staking Sum, and under no circumstances shall the Player ever be entitled to receive, retain, or utilize the Staking Sum except as expressly set forth herein.

4. **Gambling Activity.** In consultation with the Backer, the Player shall, from time to time at a time and location of the Player's choice, engage in certain casino gambling activities through one or more licensed, regulated, and fully legal online gaming portals. The Player shall only use the Staking Sum (together with any Net Profit) to play casino games agreed upon between the Player and the Backer, and the Player shall utilize best efforts to abide by strategies and decision-making analyses (the "Gaming Strategies") shared by the Backer. However, for the avoidance of doubt, the Backer shall share such Gaming Strategies before – and after – individual gambling efforts undertaken by the Player, and shall not, at any time, under any circumstances, or under any conditions, dictate during the Player's actual gambling endeavors the manner in which such Gaming Strategies are to be utilized. Rather, the Player shall utilize reasonable discretion in the individual gambling efforts undertaken by the Player.

5. **Level Payments.** It is acknowledged that the Player will expend considerable time and effort in learning the Gaming Strategies and then reinforcing and updating their knowledge of the Gaming Strategies from time to time. Therefore, the Backer recognizes that the Player should be entitled to Level Payments based upon the Qualifying Offers, as those terms are defined in this Section 5. Notwithstanding the provisions of Sections 3, 6 and 7 hereof, should the Player engage in all wagering activity contemplated herein, consistent with the Backer's guidance, the Player shall be entitled to a minimum guaranteed payment (the "Level Payments") correlative to the number of casino promotional offers ("Qualifying Offers") the Player engages with the Backer's guidance and the number of applicable deposits the Player makes into online casino interfaces with the Staking Sum (which may supplemented, from time to time, in the sole and absolute discretion of the Backer). The Level Payments shall be as follows:

| Level | Cumulative Deposits | Cumulative Offers | Cumulative Level Payments |
| --- | --- | --- | --- |
| 1 | $2,000 | 4 | $100 |
| 2 | $6,000 | 12 | $300 |
| 3 | $15,000 | 21 | $600 |
| 4 | $26,000 | 31 | $1,000 |

For the avoidance of doubt, the Player must meet *both* the number in the "Cumulative Deposits" column, and the number in the "Cumulative Offers" column, to qualify for a Level Payment correlative to the level indicated. While the Backer may elect to make a partial payment if the Player's efforts to deposit monies are frustrated by reasons beyond the Player's control, such is in the sole and absolute discretion of the Backer and the Backer shall have no contractual obligation hereunder to do so. If the Level Payment is reduced, it will be in direct proportion of

the value of deposits made at each level relative to the total value of deposits required at each level under this Agreement.

The Backer may offer the Player additional optional backing opportunities from time to time, and payment terms for these additional opportunities will be communicated in writing prior to accepting those opportunities.

6. **Computation of Completion Bonus.** Once the Player completes all such wagering activity, the Player is hereby granted a ten percent (10%) interest in any Net Profit realized by the Player (the "Completion Bonus"). The Completion Bonus shall be calculated inclusive of all monies earned by the Player in the designated gaming activities, but shall be computed so as to deduct to the whole of the Staking Sum in which the Backer shall, at all times, hold a one hundred percent (100%) interest (except to the extent such Staking Sum is lost in gambling transactions and thus becomes the property of one or more licensed casinos).

For the further avoidance of doubt, the Player shall *not* qualify for a Level Payment if the Completion Bonus is greater than the Level Payment, and any Level Payment shall be discounted by the Player's Completion Bonus if it is less than the correlative Level Payment. For purposes of determining the Player's entitlement to a Level Payment, the same shall be computed once, and only once, the Player completes all wagering activity contemplated herein. Should the Backer elect to pay the Player any monies before such date (and the Backer shall have no obligation to do so), the same shall be deducted from any payments ultimately due and owing to the Player.

7. **Acquired Interest.** The Backer shall have a one hundred percent (100%) interest in all monies realized by the Player on account of the Player's wagering activity contemplated herein until such a time as the Player completes all wagering activity contemplated herein.

8. **Time for Completing Qualifying Offers.** The Player agrees to use best efforts to complete the activities correlative to each level delineated in Section 6 hereof, within seven (7) days of such opportunity being afforded the Player. The doctrine of substantial compliance shall not apply to the requirement set forth in this Section 8.

9. **Transfer of Staking Sum.** In anticipation of engaging in the gambling activities set forth in Section 5 hereof, the Player shall transfer part or all of the Staking Sum to one or more online accounts held at the lawful, licensed and regulated casinos through which such gambling activities are to occur. Such accounts shall be opened solely in the Player's name, and shall only be opened at the express direction – and with the written approval (electronic mail sufficing) – of the Backer. The Player shall exercise best efforts to keep as little of the Staking Sum in such casino accounts as possible, endeavoring to regularly withdraw monies from such casino accounts and deposit them into the bank account contemplated by Section 2 hereof, except where expressly directed in writing (electronic mail sufficing) to do otherwise, for purposes of optimizing participation in a promotion or for other strategic reasons, by the Backer.

10. **Confidentiality.** The Gaming Strategies developed by the Backer are, and shall remain, the sole intellectual property of the Backer. The Player is hereby granted a limited, non-transferable, freely revocable license to use the Gaming Strategies while engaging the activities set forth in Section 5 hereof. The Player agrees to keep the Gaming Strategies absolutely

confidential and to not discuss the Gaming Strategies with any person other than the Backer, divulge the Gaming Strategies – in any medium whatsoever – to any person other than the Backer, reveal the mere existence of the Gaming Strategies – through any medium whatsoever – to any person other than the Backer, and to destroy any written records of the Gaming Strategies, immediately and without demand or protest, at the request of the Backer. The foregoing notwithstanding, the Player shall be free to share the Gaming Strategies with any person licensed to practice law before the highest court of any constituent state of the United States, carrying on such practice on behalf of the Player, and owing the Player a duty of confidentiality consistent with such legal practice. Additionally, the Player shall lawfully abide by any subpoena, after giving notice of such subpoena to the Backer and affording the Backer occasion to quash such subpoena, and nothing herein shall be construed as suggesting the Player may – let alone shall – destroy any evidence or documents that are the subject of a lawful subpoena.

11. **Payout.** The Player shall tender to the Backer all monies due and owing under this Agreement (the whole of the Staking Sum together with any Net Profit minus any Completion Bonus being deemed due and owing upon demand, whether formal or informal in nature), from time to time, as the Backer may so request in writing (with electronic mail or messaging sufficing as writing). Such payment shall be made to the Backer in the lawful currency of the United States, via wire, negotiable instrument, legal tender, or a reputable internet-based provider of currency transfer services. If there are any third-party transactions fees incurred by the Player in tendering such monies to the Backer, such fees may be deducted from the monies to be transferred.

12. **Comps.** During the term of this Agreement, the Player shall not accept any gratuities, complimentary gifts, perquisites, or other non-monetary benefits whatsoever, from any casino or any casino operator. Any gratuities offered in the nature of monetary consideration or so-called "free play" or so-called "matched play" shall be reduced to currency and form a part of the Staking Sum and/or Net Profit.

13. **Identity Verification and Tax Documents.** Notwithstanding the provisions of Section 1 hereof, the Backer shall have no obligation to furnish any monies to the Player until the Player first presents the Backer with

(i) a photostatic copy of government-issued identification bearing the full name and photograph of the Player; and

(ii) a form W-9, as promulgated by the Internal Revenue Service, bearing the Player's pertinent information for tax reporting purposes.

14. **Payment of Taxes.** The Player acknowledges that this Agreement does not constitute an offer of employment and the Player will be classed as an Independent Contractor for the purpose of filing taxes. The Backer is not an accountant and is not qualified to provide tax advice or tax guidance. The Backer will offer the services of their retained certified public accountant free of charge to the Player to prepare the Player's tax return. The Backer will ensure the Player receives detailed records of all transactions and will be cooperative as the Player assesses tax issues. The Backer will pay all taxes due on the Backer's share of monies realized pursuant to this Agreement.

15. **Special Electronic Mail Address.** The Player shall open a separate email account (the "Gambling Email Address") for the Gambling Activity, within two (2) days of the Effective Date. The Player must grant the Backer access at all times to the Gambling Email Address, including supplying the password to the Gambling Email Address and not enabling two-factor authentication on the Gambling Email Address. The Backer will set up recovery settings for the account to ensure ongoing access. The password must not be changed by the Player without prior agreement from the Backer. The Gambling Email Address must not be deleted by the Backer at any time. The Gambling Email Address must only be used for the Gambling Activity and communications pursuant to this Agreement, and must not be used for any other purpose. All Gambling Activity shall be conducted with utilization of the Gambling Email Address; the Player may not register for any casino promotions (within the scope of this Agreement) with any other email address.

16. **Casino Accounts.** When opening the casino accounts referenced in Section 8 hereof, the Player must utilize the Gambling E-mail Address. The Player shall grant the Backer access to the resulting casino accounts (the "Casino Accounts") at all times, except when the Player is using such to participate in gaming activity, solely for the purpose of auditing the Player's gambling activity and adherence to the terms of the Backing Agreement. The Player acknowledges that the Backer may complete an audit at any time, and no payments will be released until the audit is complete. The Player shall supply the Backer with the password to each of the Casino Accounts and shall forbear from enabling two-factor authentication on the Casino Accounts where possible. Under no circumstances will the Backer use the Casino Accounts to engage in gambling activity, or to carry out any course of conduct that constitutes the placing of wagers. Existing Casino Accounts may be retained by the Player, for personal use, which will result in a reduction of the Level Payments in direct proportion to the number of deposits required in the subject Casino Account relative to deposits required to avail of bonuses in all other Casino Accounts utilized by the Player under this Agreement. The foregoing notwithstanding, Casino Accounts may not be utilized for personal gaming activity during the duration of gambling activity provided for hereunder to ensure the continued segregation of the Player's personal funds and the Backer's staking sum.

17. **Hardware.** The Player must only use personal electronic devices, owned solely by the Player, for the Gambling Activity. The Player shall not use communal, shared or work devices for Gambling Activity.

18. **Representations and Warranties.** By entering into this Agreement, the Player expressly represents and warrants:

(i) the Player is not obligated to any person, whether legal or natural, on any unpaid or unsatisfied judgments;
(ii) the Player does not have any unpaid or unsatisfied child support or domestic support obligations;
(iii) the Player is not a convicted felon;
(iv) the Player has not been banned from playing in any one or more casinos situated within the United States of America (including the Native American reservations therein);

(v) the Player is not on any exclusion lists which prohibit – voluntarily or otherwise – the Player from engaging in casino gambling in any one or more casinos situated within the United States of America (including the Native American reservations therein);

(vi) the Player does not owe any taxing authority any monies whatsoever, excepting those correlative to taxes due and owing for the immediately preceding fiscal year which are not yet due to be tendered to such taxing authority;

(vii) the Player will only perform under this Agreement in licensed, regulated, and legal environments, and will not, under any circumstances, utilize a so-called "VPN" connection or other mechanism to evade geofencing systems while engaged in such gaming activities;

(viii) the Player acknowledges that the Player shall be solely responsible for all subscriptions and out-of-pocket expenses in maintaining expertise in the casino gambling field;

(ix) the Player has never been deported from – or declared *persona non grata* by – a sovereign nation;

(x) the Player does not now, and will not during the term of this Agreement, hold in any depository institution, whether under the Player's own name or in an account in which the Player holds any beneficial interest whatsoever, monies that (a) are the proceeds of one or more criminal activities, (b) emanate from the Democratic People's Republic of Korea, the Islamic Republic of Iran, the Bolivarian Republic of Venezuela, the Republic of Cuba, or any other nation or republic from which the United States government prohibits or restricts the importation of monies; and/or (c) which are the subject of any pending asset forfeiture proceeding;

(xi) the Player will not introduce, for the full term of this Agreement, any cheating device into any casino environment;

(xii) the Player is not now, and never has been, known by any other name, excepting maiden names or former married names which changed on account of the Player's marriage to – or divorce from – one or more persons;

(xiii) the Player is not now, and never has been, the subject of any petition filed pursuant to Section 301 of Title 11 of the United States Code, Section 302 of Title 11 of the United States Code, or Section 303 of Title 11 of the United States Code; and

(xiv) the Player has not provided inaccurate or misleading information, to the Backer or any agent of the Backer, about their federal tax status and/or other financial affairs.

19. **No Joint Venture.** No joint venture is created by this Agreement, and this Agreement shall not be construed as creating a joint venture or as evidencing the creation of any joint venture between the Player and the Backer.

20. **No Sale of Securities.** Inasmuch as the Backer is not acquiring an interest in any corporate form or entity, the interests conveyed hereunder cannot be reduced to a balance sheet or standard GAAP-compliant financial statements, and there exists no mechanism for the registration or reported exemption of the interests created hereunder with the United States Securities and Exchange Commission, the Parties expressly acknowledge that the interest conveyed hereunder is not a security and is not intended to be construed as a security but, rather, is in the nature and form of a personal services contract.

21. **Termination.** This Agreement shall terminate upon the first to occur of

(i) the Player giving the Backer written notice (electronic mail sufficing) of such termination, for any reason or no reason at all;
(ii) the Backer giving the Player written notice (electronic mail sufficing) of such termination, for any reason or no reason at all;
(iii) the death of the Player;
(iv) the death of the Backer; or
(v) the declaration of the Player to be non compos mentis, by any court of competent jurisdiction.

However, the provisions of Sections 2, 3, 4, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 and 22 shall survive the termination of this Agreement for the lesser of

(i) thirty (30) years; or
(ii) the maximum period of time permitted by controlling law.

Upon termination of this Agreement, the Player shall be bound to immediately tender the whole of the Staking Sum together with any Net Profit minus any Completion Bonus being deemed due and owing - to the Backer, without demand, protest, or delay and in no event shall the Player wait more than seven (7) calendar days to tender such sum to the Backer. For the avoidance of doubt, the Player must use all best efforts to tender the whole of the Staking Sum together with any Net Profit minus any Completion Bonus being deemed due and owing - to the Backer, without demand or protest, within seven (7) calendar days of the termination of this Agreement.

22. **Military Service.** The Player acknowledges they are not currently enlisted in the United States Armed Forces and shall promptly notify the Backer should they enlist or be drafted into the United States Armed Forces. For the avoidance of doubt, enlistment in the United States Armed Forces will *not* constitute a breach of this Agreement, nor will it lead to termination of this Agreement or any differentiated treatment of the Player whatsoever; the Backer simply seeks this information to ensure compliance with the Servicemembers Civil Relief Act.

23. **Entire Understanding.** This Agreement contains the entire understanding between the Parties. No modification or waiver of any of the terms of this Agreement shall be valid unless made in writing and signed by the Parties.

24. **Savings Clause.** If any provision of this Agreement is held to be invalid or unenforceable, all other provisions shall nevertheless continue in full force and effect.

25. **Counterparts.** This Agreement may be executed in duplicate and the duplicate shall have the same force and effect as if it were the original copy.

26. **Governing Law and Venue.** This Agreement shall be governed by and interpreted in accordance with the laws of the State of Maryland, without regard to its conflicts of law provisions. The Parties further agree that all disputes relating to the enforcement of any obligations arising under this Agreement, or otherwise relating to this Agreement, shall be subject to the exclusive jurisdiction and venue of the state or federal courts located in or having jurisdiction over

Montgomery County, Maryland and that the Parties shall be subject to the personal jurisdiction of those courts.

27. **Attorneys' Fees and Suit Costs.** Should either Party fail to perform his or her obligations under this Agreement, and the other Party is forced to take legal action to collect monies due and owing or to enforce the provisions of this Agreement (including the confidentiality provisions), the prevailing Party in such legal action shall be entitled to payment of his or her full attorneys' fees and suit costs unless the trial court shall find such an award to be inequitable in nature. The Backer shall be entitled to temporary, preliminary, and final injunctive relief to enforce the provisions of Section 10 hereof, and the Player does hereby consent to the entry of such injunctive relief.

28. **Forfeiture of Monies.** Should the Player breach this Agreement, they will forfeit all entitlement to any monies otherwise owed pursuant to this Agreement except for the sum of One Hundred Dollars and No Cents ($100.00) which the Player shall remain entitled to as consideration for the efforts expended pursuant to this Agreement and the other covenants and obligations contained herein.

29. **Headings.** The headings used in this Agreement are for ease of reference only, and shall not be deemed a substantive portion of this Agreement.

30. **Construction.** This Agreement shall be construed without regard to any presumption or other rule of law requiring construction against the party who caused it to be drafted.

31. **Recitals.** The above recitals form an integral and substantive part of this Agreement and are incorporated herein by reference.

IN WITNESS WHEREOF, the signatures and seals of the Player and the Backer:

08/15/2025                         Vishal Birsingh                     (SEAL)
Date                               Verified by signNow                 vbirsingh@hotmail.com
                                   08/15/2025 14:17:48 UTC
                                   1b8217f6a33a84b349d33

08/26/2025                         Jack Etherington                    (SEAL)
Date                               Verified by signNow       ents LLP
                                   08/26/2025 14:18:37 UTC
                                   d1c8e2ad69aa43c3a259